# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                      No. CR 18-3321 JB

WILLIAM SERNA,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Evidence Obtained as a Fruit of Unlawful Seizure, filed January 6, 2019 (Doc. 28)("Motion"). The Court held an evidentiary hearing on February 21, 2019. <u>See</u> Clerk's Minutes at 1, filed February 21, 2019 (Doc. 37). The primary issues are: (i) whether Albuquerque[1] Police Department ("APD") Sergeant Peter Silva seized Defendant William Serna by ordering that Serna keep his hands where Silva could see them; and (ii) whether Silva had reasonable suspicion to seize Serna after Silva observed Serna exchanging cash with Edward Fuentes in Robinson Park,[2] when Silva knew that APD had previously arrested Serna for drug-related activities and that Robinson Park has a reputation as a site for drug trafficking. The Court concludes that: (i) Silva seized Serna when he ordered that Serna keep his hands visible; and (ii) based on the facts recited above, Silva had reasonable suspicion to seize Serna.

---

[1]Albuquerque, New Mexico.

[2]Robinson Park is in downtown Albuquerque.

**FINDINGS OF FACT**

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. The United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States of America do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements. See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[3]("[T]he

_____

[3]United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished opinion from the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this Circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a

Supreme Court [of the United States] has made it clear hearsay is admissible in suppression hearings. . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).

1.     APD has employed Silva as a sergeant for two years and as an APD officer for fourteen years.  See Draft Transcript of Hearing at 5:15-19 (taken February 20, 2019)(Outler, Silva)("Tr.").[4]

2.     The Court deems Silva's testimony credible, with the exception of his testimony about what denomination of bill Fuentes held as Serna approached him.[5]

_____

case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Lopez-Carillo, United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), United States v. Wilson, 96 F. App'x 640 (10th Cir. 2004)(unpublished), United States v. Carter, 172 F. App'x 883 (10th Cir. 2006), and United States v. Ellis, 180 F. App'x 827, 829 (10th Cir. 2006), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[5]Silva's testimony about the bill diverges from the facts, and the Court doubts that Silva could have seen well the bill as he approached Serna and Fuentes.  The DVD: Bodycam Video from Sgt. P. Silva at 00:00:04-:14, taken September 3, 2018, filed February 20, 2019 (on file with court)("Bodycam Video"), reflects that Silva almost certainly could not have discerned the bill's denomination.  Moreover, at the time of the encounter, Silva took the bill for a ten-dollar bill.  See Bodycam Video at 00:00:31-:32.  Later events revealed that Fuentes was holding a twenty-dollar bill.  See Tr. at 25:15-26:5 (Hannum, Silva).  In the Criminal Complaint at 1-2, filed January 22, 2019 (Doc. 34-1), and in his testimony before the Court, both of which Silva made after discovering the bill's true denomination, Silva reports that he observed a twenty-dollar bill as he

3.      As a sergeant, Silva supervises eight officers.  <u>See</u> Tr. at 9:18-21 (Outler, Silva).

4.      In his supervisory role, Silva reviews these APD officers' reports and approves their complaints.  <u>See</u> Tr. at 9:22 (Outler, Silva).

5.      Although before September 3, 2018, Silva had not personally arrested Serna, <u>see</u> Tr. at 13:24-25 (Silva), Serna was a "person of interest," <u>see</u> Tr. at 14:17-19 (Silva), and Silva knew that one of his APD officers had arrested Serna, <u>see</u> Tr. at 13:6-11 (Silva), "was aware of" Serna's "previous booking slips" for the City of Albuquerque, Tr. at 14:14-16 (Silva), and had previously examined Serna's criminal record, <u>see</u> Tr. at 14:24-15:1 (Silva).

6.      Serna's previous offenses included drug-related activities.  <u>See</u> Tr. at 14:21-23 (Silva).

7.      Silva had met Serna "a few days" before September 3, 2018, Tr. at 29:14 (Humman, Silva), but, at that earlier time, Silva initially mistook Serna for someone else, <u>see</u> Tr. at 29:20-22 (Silva).

8.      During that earlier encounter, Silva realized his mistake, <u>see</u> Tr. at 29:23-30:1 (Silva), and identified who Serna was, <u>see</u> Tr. at 33:2-9 (Outler, Silva).

9.      On September 3, 2018, Silva was on duty patrolling the downtown area, which encompasses the area bounded by Broadway Boulevard on the East, 12th Street on the West, Lomas Boulevard on the North, and Lead Avenue on the South.  <u>See</u> Tr. at 6:2-12 (Outler, Silva).

---

approached, <u>see</u> Tr.Tr. at 13:15-23 (Silva); <u>id.</u> at 15:24-16:13 (Silva, Outler); <u>id.</u> at 25:15-26:5 (Hannum, Silva).

10.     During his shift, Silva was on bicycle patrol, <u>see</u> Tr. at 7:10-12 (Outler, Silva), and rode around Robinson Park, which sits between Central Avenue, 8th Street, and Copper Avenue, <u>see</u> Tr. at 6:17-22 (Outler, Silva).

11.     Silva and/or the APD officers he supervises patrol Robinson Park daily.  <u>See</u> Tr. at 7:4-9 (Outler, Silva).

12.     Silva and his APD officers "make constant contact with people at that park, and[, although] it doesn't always involve narc[otic] things," Tr. at 13:7-8 (Silva), Silva and his APD officers patrol the area daily because they receive complaints about drug activity in the park; people buy and sell drugs, and litter the area with syringes, <u>see</u> Tr. at 9:8-12 (Silva).

13.     Silva has read about such grievances and drug activity in his APD officers' reports and complaints.  <u>See</u> Tr. at 9:18-24 (Outler, Silva).

14.     Each year, Silva and/or his APD officers arrest around twenty people for drug-related activity that occurs in Robinson Park.  <u>See</u> Tr. at 9:25-10:5 (Outler, Silva).

15.     On September 3, Silva was bicycling west on Central Avenue when he arrived at Robinson Park with APD Officers George Gabaldon, Mike Avila, and Mark Wells.  <u>See</u> Tr. at 7:18-8:2 (Outler, Silva).

16.     The officers rode in a line, one behind the other, with Silva at the back.  <u>See</u> Tr. at 11:6-8; DVD: Bodycam Video from Sgt. P. Silva at 00:00:04-:14, taken September 3, 2018, filed February 20, 2019 (on file with court)("Bodycam Video").

17.     The officers were armed and in uniform.  <u>See</u> <u>generally</u> Bodycam Video.

18.     Two men stood at the southeast end of Robinson Park, where the park nears 8th Street.  <u>See</u> Tr. at 8:5-9 (Outler, Silva); Bodycam Video at 00:00:05-:17.

19.     The men were facing each other in close proximity, <u>see</u> Tr. at 8:14-19 (Outler, Silva); Bodycam Video at 00:00:05-:17, and were engaged in an "hand to hand exchange," Tr. at 8:12-13 (Silva).  <u>See</u> <u>id.</u> at 8:9-13 (Silva); Bodycam Video at 00:00:16-:21.

20.     Silva observed these men as he approached then rode alongside the park.  <u>See</u> Tr. at 8:4-13 (Outler, Silva).

21.     When he first observed them, Silva was around thirty to forty feet from the men. <u>See</u> Tr. at 8:22-24 (Outler, Silva).

22.     At that time, Silva did not recognize Serna.  <u>See</u> Tr. at 15:5-9 (Silva).

23.     To Silva, the men did not appear engaged in a "casual conversation."  Tr. at 13:21. <u>See</u> <u>id.</u> at 13:19-21 (Silva).

24.     After Silva observed the men, he turned and jumped his bicycle over the curb to enter the park.  <u>See</u> Tr. at 10:11-16 (Silva); Bodycam Video at 00:00:14-:16.

25.     When Silva turned his bicycle, Gabaldon, who was riding immediately in front of Silva, turned with him, but Avila and Wells followed slightly later.  <u>See</u> Tr. at 11:11-13 (Silva).

26.     As Silva "got into the park," he recognized Serna.  Tr. at 15:8 (Silva).  <u>See</u> <u>id.</u> at Tr. at 13:16-19 (Silva); <u>id.</u> at 15:6-9 (Silva).

27.     Silva did not recognize the other man -- Fuentes, <u>see</u> Tr. at 16-18 (Outler, Silva), and Silva's APD officers had not previously arrested Fuentes, <u>see</u> Tr. at 16:19-21 (Outler, Silva).

28.     Once in the park, Silva observed that Serna and Fuentes were exchanging cash.  <u>See</u> Tr. at 10:18-21 (Silva).

29.     As Silva approached them, he asked "what they were doing," Tr. at 11:21 (Silva), and, at the question, Fuentes "kind of" raised a hand, Tr. at 11:22-23 (Silva).  See Bodycam Video at 00:00:16-:20.

30.     Silva then stopped his bicycle within ten to twenty feet of Serna and Fuentes.  See Tr. at 10:17-18 (Silva); id. at 29:16-17 (Silva).

31.     As Silva dismounted his bicycle, Silva told Serna and Fuentes to keep their hands where he could see them, see Tr. at 11:23-24 (Silva); id. at 12:5-7 (Silva), and Serna and Fuentes "immediately put their hands up in the air," Tr. at 12:7 (Silva); see Bodycam Video at 00:00:00:24.

32.     Serna placed his hands on his head, see Tr. at 19:15-17 (Silva); Bodycam Video at 00:00:25, although Silva had not told Serna to put his hands there, see Tr. at 19:18-24 (Silva).

33.     By asking Serna and Fuentes to keep their hands visible, Silva intended to prevent either man from throwing away or pocketing evidence of a drug sale, and/or from hiding a weapon.  See Tr. at 12:20-13:3 (Silva).

34.     Avila and Wells arrived at the scene about a minute later.  See Tr. at 31:20-23 (Hannum, Silva).

35.     Fuentes told Silva that he was "buying a lighter."  Tr. at 11:25 (Silva).

36.     Silva responded: "You're buying a lighter for what ten dollars?"  Bodycam Video at 00:00:31-:32.

37.     Fuentes replied: "Well, I didn't wanna walk."  Bodycam Video at 00:00:35-:36.

38.     Silva suspected that Serna and Fuentes were involved in a narcotics exchange, see Tr. at 13:13 (Silva); id. at 17:2-5 (Silva), because he thought that the amount was high for a lighter,

see Tr. at 16:1-3 (Silva), and hence that the answer was nonsensical and dishonest, see Tr. at 16:7-13 (Silva, Outler).

39.     Accordingly, Silva planned to continue questioning Serna and Fuentes.  See Tr. at 17:2-5 (Silva).

40.     Silva repeated: "Keep your hands where I can see them," Bodycam Video at 00:00:37-:38, and Silva told Fuentes: "Put your hands on the top of your head," Bodycam Video at 00:00:39-:40.

41.     Silva approached Serna and placed his hands on Serna's hands, which Serna had kept on his head.  See Bodycam Video at 00:00:42-:44.

42.     Simultaneously, Silva asked Serna if he had weapons on him, see Tr. at 17:7 (Silva); Bodycam Video at 00:00:42-:43, and Serna answered that he did, see Tr. at 17:8-9 (Silva).

43.     Serna's response surprised and concerned Silva, because individuals who have small weapons, such as pocketknives or razor blades, often specify that they have "pocketknives" or "razor blades."  Tr. at 17:9-17:22 (Silva).

44.     After hearing Serna's reply, Silva alerted Gabaldon, Avila, and Wells that Serna had a weapon.  See Bodycam Video at 00:00:48-:49.

45.     Silva also began a pat down and directed Serna: "[S]pread your feet more; spread your feet more."  Bodycam Video at 00:00:49-:52.

46.     Although Silva did not ask Serna to get on his knees or to lay on the ground, see Tr. at 20:3-13 (Silva), Serna asked if he could lie down so that the APD officers did not "beat [him] up," Tr. at 18:5 (Silva); see Tr. at 18:3-5 (Silva); Bodycam Video at 00:00:43-:56.

47.     Silva helped Serna to his knees then to the ground, see Tr. at 18:5-7 (Silva); Bodycam Video at 00:00:57-:01:03, by holding Serna's hands to prevent Serna from falling forward as Serna worked his way down, see Tr. at 20:15-20 (Silva); Bodycam Video at 00:00:57-:01:03.

48.     After Silva asked Serna where the weapon was located, see Tr. at 18:7-8 (Silva); Bodycam Video at 00:0101:04-:05, Serna stated that the weapon was in his right pocket, see Tr. at 18:8-9 (Silva); Bodycam Video at 00:01:05-06.

49.     While Silva reached into the right pocket, Serna corrected himself and clarified that the weapon was in the left pocket. See Tr. at 18:10-11 (Silva); Bodycam Video at 00:01:09-:11.

50.     While reaching toward the left pocket, Silva asked Serna what the weapon was, and Serna revealed that he carried a gun. See Tr. at 18:11-12 (Silva); Bodycam Video at 00:01:11-:14.

51.     As he looked toward the left pocket, Silva saw and identified the gun as a semi-automatic. See Tr. at 18:13-15 (Silva); id. at 18:16-18 (Silva).

52.     As Silva removed the gun from the pocket, see Tr. at 18:19-21 (Silva), he announced to Gabaldon, Avila, and Wells that Serna had a weapon, see Tr. at 18:23-25 (Silva).

53.     Silva then stepped back from Serna, removed the bullets from the weapon, and stored it in his bike bag. See Tr. at 19:1-6 (Silva).

54.     Silva never drew a weapon, see Tr. at 21:18-21 (Outler, Silva), and Silva does not recall seeing any other APD officer draw a weapon, see Tr. at 21:22-25 (Silva).

**PROCEDURAL BACKGROUND**

On September 3, 2018, a grand jury indicted Serna for violating 18 U.S.C. § 922(g)(1), "Felon in Possession of a Firearm." See Indictment at 1, filed October 11, 2018 (Doc. 11). Serna's

case arose on a Criminal Complaint, filed September 14, 2018 (Doc. 1), for the same offense. Criminal Complaint at 1. Serna filed the Motion four months later, on January 6, 2019. See Motion at 5.

### 1.    **The Motion.**

Serna asks that the Court suppress all evidence obtained pursuant to Silva's alleged seizure, because Silva seized Serna without reasonable suspicion. See Motion at 1. Serna begins by contending that Silva seized Serna when Silva commanded Serna to keep his hands visible. See Motion at 3-4. Serna describes that police commit a seizure when, "considering all the surrounding circumstances, the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Motion at 3 (internal quotation marks omitted)(quoting United States v. King, 990 F.2d 1552, 1556 (10th Cir. 1993)). Serna explains that, "[i]n *California v. Hodari D.*, 499 U.S. 621 (1991), the United States Supreme Court made it clear that a seizure of the person under the Fourth Amendment to the Constitution of the United States occurs when an officer applies physical force, however slight, *or* when the person submits to an officer's show of authority." Motion at 3 (emphasis in Motion). Serna contends that, according to these definitions, Silva committed a seizure when he gave Serna "some kind of command to raise his hands or put them on his head." Motion at 3. Serna further fleshes out the definition for a seizure:

> A seizure under the Fourth Amendment occurs when "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)(quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In *United States v. Hill*, 199 F.3d 1143 (10th Cir. 1999), the Tenth Circuit has recognized a set of non-exclusive factors to help guide a determination of whether a person has been seized. Among these factors are the threatening presence of several officers, some physical touching by an officer, and use of aggressive

language or tone of voice indicating that compliance with an officer's request is compulsory. *Id.*, at 1147-48.

Motion at 3. Serna states that no single factor the Tenth Circuit lists is dispositive and that Silva "apparently commanded [Serna] in a tone sufficiently stern that Serna immediately turned around and place [sic] his hands on top of his head." Motion at 3-4.

Serna then argues that Silva lacked reasonable suspicion to seize Serna. <u>See</u> Motion at 4. According to Serna, <u>Brown v. Texas</u>, 443 U.S. 47 (1979), clarifies that a police officer does not obtain reasonable suspicion when he or she observes an individual with simply a suspicious appearance even if the individual is in a "high crime area." Motion at 4 (quoting <u>Brown v. Texas</u>, 443 U.S. at 48-49). Serna avers that Silva observed only "two men standing together in a public park" and "some kind of exchange." Motion at 5. In Serna's opinion, the caselaw establishes that these observations do not constitute reasonable suspicion. Motion at 5.

## 2. **The Response.**

Plaintiff United States of America responds and asks that the Court conclude that Silva lawfully seized Serna. <u>See</u> United States' Amended Response in Opposition to Defendant's Motion to Suppress Evidence at 1, filed January 22, 2019 (Doc. 34)("Response"). The United States begins with the contention that Silva did not seize Serna by ordering Serna to keep his hands visible. <u>See</u> Response at 3. The United States would have the Court view the encounter as a "consensual police encounter." Response at 5. The United States portrays the standard for seizure:

> The seizure of a person occurs only "[w]hen a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16 (1967). In contrast, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

Response at 3-4. According to the United States, Silva did not limit Serna's freedom of movement or physically control Serna; rather, the United States describes that Silva just asked Serna some questions. See Response at 4. The United States compares the situation to United States v. Mendenhall, 446 U.S. 544 (1980), wherein the Supreme Court held that no seizure occurred where law enforcement agents approached and questioned a woman at an airport. See Response at 4. The United States contends that the Court should likewise conclude that Silva did not seize Serna. See Response at 4. According to the United States, that Silva, Gabaldon, Avila, and Wells carried guns, and wore uniforms, does not convert the action into a seizure. See Response at 4. Similarly, in the United States' view, a seizure under the Fourth Amendment did not occur simply because "both men immediately acted as though they had been busted by the police." Response at 5.

The United States next contends that Silva had reasonable suspicion to detain Serna. See Response at 5. The United States describes:

> For an investigative detention to be justified at its inception, the officer must have specific, articulable facts, along with rational inferences drawn from those facts, that give rise to a reasonable suspicion that a person is committing a crime. *See* [United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir. 2009)]. While this requires the officer to have more than just a hunch, it requires considerably less proof than probable cause and it does not require the officer first to rule out innocent conduct. *See id.* If an officer has a particularized and objective basis for suspecting a person, he may initiate an investigatory detention even if it is equally or even more likely that the person is not committing a crime. *See United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013).

Response at 6. The United States describes that Serna "appeared in plain sight to be doing exactly that which the park is known for -- furtively taking cash from another individual while handing something small back." Response at 7. According to the United States, Silva recognized Serna as a person who had previously engaged in drug trafficking. See Response at 7. For the United States, these factors together establish reasonable suspicion. See Response at 7.

The United States continues and argues that Silva subsequently acted properly in patting down Silva.  See Response at 7.  The United States notes that the pat down was reasonable, because, according to the United States, Serna admitted that he was carrying a firearm and, even if Serna had not made that admission, Silva's prior knowledge about Serna and recent observations justified patting him down.  See Response at 7-8.

**3.    The Hearing.**

As Serna began his argument, the Court interrupted to clarify that an investigative detention as described in Terry v. Ohio, 392 U.S. 1, 16 (1967))(hereinafter, also "Terry stop"), is a seizure.[6] See Tr. at 35:4-6 (Court).  After Serna agreed with the Court, see Tr. at 35:7 (Hannum), the Court asked: "So aren't we really just trying to determine at what point, if at all[,] Mr. [Silva had] reasonable suspicion to conduct a [Terry stop]?]"  Tr. at 35:8-10 (Court).  Serna concurred that this issue "is the question before the Court."  See Tr. at 35:11-12 (Hannum).

The Court summarized that a Terry stop and a pat down occurred but that the Tenth Circuit's standard for reasonable suspicion is low.  See Tr. at 35:19-36:3 (Court).  The Court, hence, queried why Serna thinks that Silva lacked reasonable suspicion.  See Tr. at 36:5-7 (Court).  Serna first clarified that Silva seized Serna when Silva ordered Serna to keep his hands visible, because, according to Serna, Silva addressed Serna and Fuentes in a "forceful tone," Tr. at 36:14-15 (Hannum), and Serna "acquiesced to that show of authority," Tr. at 36:18-19 (Hannum).  See id. at 36:7-20 (Hannum).  To this statement, the Court responded by asking why Serna thinks that

---

[6]An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000)(quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).

Silva did not have reasonable suspicion at that point, because, as the Court summarized, Silva had observed an individual whom Silva knew had been involved in drug activity, in a park known for drug trafficking, exchanging ten dollars with another man. See Tr. at 37:2-6 (Court). Serna argued that Silva could not see the bill's denomination and that Silva's willingness to change his testimony regarding the denomination that he observed -- from ten to twenty dollars -- undermines his credibility. See Tr. at 40:1-15 (Hannum). Serna indicated that Silva's testimony contradicts the Bodycam Video; according to Serna, the Bodycam Video shows that Silva asked Fuentes if he was buying a lighter for ten dollars, see Tr. at 37:15-18 (Hannum), but Silva testified that Fuentes had a twenty-dollar bill, see Tr. at 37:7-14 (Hannum). Serna further contended that, from the distance from which Silva observed Serna and Fuentes, Silva could not have known whether Fuentes held a ten-dollar, a twenty-dollar, or a lower-denomination bill, or even whether Serna and Fuentes were exchanging cash. See Tr. at 37:19-38:5 (Hannum).

The Court, however, asked: "Isn't that . . . what's going on down[town] . . . APD they see a hand to hand [ex]change . . . they're going to say that it looks to them like it's a drug transaction." Tr. at 38:6-11 (Court). Serna agreed: "I have no doubt that most APD officers would say that." Tr. at 38:12-13 (Hannum). Serna nevertheless contended that "the information [credibly] available to [S]ergeant Silva at the moment of the seizure does not amount to reasonable [suspicion] of a hand to hand drug buy." Tr. at 38:25-39:2 (Hannum).

The Court asked Serna what more Silva would have needed to have reasonable suspicion. See Tr. at 39:3-8 (Court). Serna responded that Silva needed to have observed evidence that more closely reflected that Serna and Fuentes were exchanging drugs; according to Serna, Silva would

have reasonable suspicion if he saw a baggie or a syringe, and not cash.  See Tr. at 39:9-13 (Court, Hannum).

The United States then took the stand for its argument.  See Tr. at 40:16-19 (Court, Outler). The Court asked the United States at what moment Silva had reasonable suspicion.  See Tr. at 40:23-24 (Court).  The United States responded that Silva had reasonable suspicion when he steered his bike into Robinson Park after seeing the two men exchanging something.  See Tr. at 40:24-41:4 (Court).  The Court asked: "He doesn't see that until he's approaching on the [grass] right?"  Tr. at 41:5-7 (Court).  The United States responded that Silva did not see that Serna and Fuentes were exchanging cash until he was in the park, but that, from the street, he saw that they were exchanging something.  See Tr. at 41:8-13 (Outler).  The Court clarified that these facts are not in the video, and the United States agreed that Silva had testified to these facts.  See Tr. at 41:14-19 (Court, Outler).  The United States summarizes that Silva rode by Robinson Park, "an area that is known to be kind of a hotbed of drug trafficking," and in which "he kn[ew] the officers under his command have made drug related arrests," and he "s[aw] two men standing doing some sort of [exchange] and . . . [it] look[s] as though they're doing exactly what the park is well known for . . ."  Tr. at 41:20-42:6 (Outler).  The United States argued that, at that point, Silva had reasonable suspicion.  See Tr. at 42:6-8 (Outler).

The United States noted that it disputes whether Silva seized Serna when Silva asked Serna to keep his hands visible.  See Tr. at 42:8-15 (Outler).  The United States indicated that it takes the position that Silva's interaction with Serna and Fuentes was "a voluntary encounter."  Tr. at 42:11 (Outler).  See Tr. at 42:7-15 (Outler).  The Court replied that, likely, Silva's order for Serna to keep his hands visible was a seizure.  See Tr. at 42:23-25 (Court).  To this comment, the United

States responded: "And I might have an intellectual disagreement with the Court on that just for the sake of argument, but I don't really think it's worth arguing about." Tr. at 43:1-4 (Outler).

The United States summarized that Silva's reasonable suspicion mounted after Silva saw the cash and Fuentes said that he was buying a lighter. See Tr. at 43:1-18 (Outler). The United States explained that "a number of factors can aggregate together to form reasonable suspicion." Tr. at 43:25-44:1 (Outler). The United States continued, arguing that the pat down was not "a formal pat down in the traditional sense, because it wasn't necessary. At that point he already knew there was a weapon." Tr. at 44:12-15 (Outler).

Serna replied. See Tr. at 45:7 (Hannum). Serna noted that Silva testified that Serna had been arrested for drug-related activity, but not that Serna had been convicted following those arrests. See Tr. at 45:14-17 (Hannum). Serna also emphasized that Fuentes told Silva that he was buying a lighter after Silva had seized Serna and so, according to Serna, that statement should not factor into the reasonable-suspicion analysis. See Tr. at 45:18-46:6 (Hannum). The Court then interjected that, assuming "that you have a valid Terry stop," Tr. at 46:9 (Court), when Silva ordered Serna to keep his hands visible, the other evidence became relevant to determining how long the "Terry stop should last," Tr. at 46:13 (Court). See Tr. at 46:8-17 (Court). After that comment, Serna admitted that, although "there is or there could be a question as to at what point this ripens into an arrest," Tr. at 46:23-24 (Hannum), his "argument really is not focused on" that question, Tr. at 47:3 (Hannum). See Tr. at 46:23-47:3 (Hannum). The Court agreed and noted that the question of arrest is not at issue here, because no one contends that probable cause existed before Serna said "I got a [weapon]." Tr. at 47:11 (Court). See id. at 47:4-14 (Court, Outler).

After Serna's arguments, the Court concluded that it would "take a closer look at" the Motion. Tr. at 47:20-21 (Court). The Court indicated that it likely would deny the Motion and would conclude that Silva had reasonable suspicion to undertake a Terry stop. See Tr. at 47:21-25 (Court). The Court stated that it would nevertheless consider the question and that it would soon issue an opinion to the parties. See Tr. at 48:2-4 (Court). This Memorandum Opinion and Order is the promised opinion.

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). See also Dorato v. Smith, 108 F. Supp. 3d. 1064, 1118 (D.N.M. 2015)(Browning, J.)(noting that investigative stops are seizures); United States v. Young, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure). "A police officer may seize someone either by physical force or a show of authority." United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 626). "[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." United States v. Salazar, 609 F.3d at 1064 (internal quotation marks omitted)(quoting California v.

Hodari D., 499 U.S. at 628). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. at 554)). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

1.      **Consensual Encounters.**

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter. See Oliver v. Woods, 209 F.3d at 1186. For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

2.      **Investigative Stops.**

In United States v. King, the Tenth Circuit noted: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a

'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty." <u>United States v. King</u>, 990 F.2d at 1557 (internal citations omitted)(quoting <u>Terry v. Ohio</u>, 392 U.S. at 16, 27). The Tenth Circuit has recognized that, in <u>Terry v. Ohio</u>, the Supreme Court identified two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk." <u>United States v. King</u>, 990 F.2d 1557 (citations omitted). The Tenth Circuit explained:

> <u>Terry</u> has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

<u>United States v. King</u>, 990 F.2d at 1557. When evaluating any of these actions, a court asks whether the action was reasonable under the Fourth Amendment. <u>United States v. Wilson</u>, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished); <u>United States v. King</u>, 990 F.2d at 1557.

### a. <u>Investigative Detentions and Reasonable Suspicion.</u>

A police-citizen encounter that is not consensual may be a constitutional investigative detention. <u>See</u> <u>Dorato v. Smith</u>, 108 F. Supp. 3d at 1118. An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972)). Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment. <u>Dorato v. Smith</u>, 108 F. Supp. 3d at 1118. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)). Second, the investigative

detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, <u>Terry v. Ohio</u>, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," <u>United States v. Holt</u>, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." <u>United States v. Winder</u>, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting <u>United States v. Vercher</u>, 358 F.3d 1257, 1261 (10th Cir. 2004)). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. <u>United States v. Winder</u>, 557 F.3d at 1134 (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002). <u>See</u> <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

In <u>United States v. Johnson</u>, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. <u>See</u> 364 F.3d at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot. <u>See</u> 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable

details."). While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient. See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night. See 355 F. App'x at 227-28. A truck pulled alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk. See 355 F. App'x at 228. Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk. See 355 F. App'x at 228. The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused. See 355 F. App'x at 228. Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled behind the truck. 355 F. App'x at 228, 229. Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, that he did not have a driver's license, and that he had a gun and other items in his vehicle. See 355 F. App'x at 227-29. The Tenth Circuit concluded that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant." 355 F. App'x at 229. The Tenth Circuit explained, in an opinion that the Honorable Michael R. Murphy, now-Senior United States Circuit Judge for the Tenth Circuit, wrote and the

Honorable Mary Beck Briscoe, United States Circuit Judge for the Tenth Circuit, and the

Honorable Robert H. McWilliams, late-United States Circuit Judge for the Tenth Circuit, joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night. He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street. Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street. Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking. He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime

of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion.

See 355 F. App'x at 229. The Tenth Circuit was content to find that a reasonable officer would

have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."

355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a

reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was

about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth

Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vázquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in was "consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct. 483 F. App'x at 418 (internal quotation marks omitted)(quoting United States v. Aragones, No. CR 10-2453 MV, 2011 WL 13174481, at *19 (D.N.M. June 10, 2011)(Vázquez, J.)). The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior." United States v. Aragones, 483 F. App'x at 418. The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque, N.M., Ordinance § 12-2-21(B)). The Tenth Circuit, thus, reversed Judge Vázquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

### b. Frisks.

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citations omitted)). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

### c. Traffic Stops.

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d at 1220. "For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers." United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945. See United States v. Wilson, 96

F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))). The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart." United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion. See United States v. Holt, 264 F.3d at 1230. "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220). A court must examine "both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)). "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope

of the [further] detention must be carefully tailored to its underlying justification.'" United States

v. Wilson, 96 F. App'x at 644 (alterations in original)(quoting United States v. Wood, 106 F.3d

942, 945 (10th Cir. 1997)).    "A traffic stop is justified at its inception if an officer

has . . . reasonable articulable suspicion that a particular motorist has violated any of the

traffic . . . regulations of the jurisdiction."  United States v. Winder, 557 F.3d at 1134.

### 3.  **Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or

detention," Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360,

1363 (10th Cir. 1984)); a police-citizen encounter that goes beyond the limits of a stop under Terry

v. Ohio is an arrest.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter

between police and an individual which goes beyond the limits of a Terry stop, however, may be

constitutionally justified only by probable cause or consent.").  The general rule is that "the use of

firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person

has been placed under arrest.[7]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir.

1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be

supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M.

---

[7]The use of handcuffs, however, does not always elevate a detention into an arrest.
See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of
handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS,
2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the
defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had
recently assaulted a person on the side of the road by threatening him with a gun); United States
v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of
handcuffs . . . does not always elevate a detention into an arrest.").

2011)(Browning, J.).    See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013).    "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001); and citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more than mere suspicion.'" United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir.

2002)). Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'" Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations in original)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

a.    **When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. See United States v. Perea, 374 F. Supp. 2d at 976. In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an

arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers

effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop

is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States

v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States

v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and

dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a

formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he

use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or

when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8

F.3d at 1462)).

There "exist[s], however, a limited set of circumstances in which officers may draw their

guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with

a stop is permissible where the police reasonably believe the weapons are necessary for their

protection.'"  United States v. Perea, 374 F. Supp. 2d at 974.  See United States v. Merkley, 988

F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the

defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone

and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040

(7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was

not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir.

1990)(holding that the law enforcement officers did not convert the stop into an arrest by

"unholstering their guns and frisking" the defendant when they suspected that the defendant had

"just completed a narcotics purchase," there were a number of "innocent bystanders on the

crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").  United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety.  *United States v. King,* 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting *Terry v. Ohio,* 392 U.S. 1, 20 . . . (1968)).  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

      **b.**     **Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been

committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)(en banc)).

In Romero v. Fay, the Tenth Circuit confronted the issue of when an officer must conduct further investigation before arresting an individual. In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder. See 45 F.3d at 1474. Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder. See 45 F.3d at 1474. After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi. See 45 F.3d at 1474. The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred. See 45 F.3d at 1474. The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff. 45 F.3d at 1474. The officer never interviewed the alibi witnesses. See 45 F.3d at 1474. The plaintiff was incarcerated for three months before the government dismissed the case and he was released. See 45 F.3d at 1474.

The plaintiff brought a 42 U.S.C. § 1983 action for, among other things, violations of his Fourth Amendment rights. See Romero v. Fay, 45 F.3d at 1474. The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause,

under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him. See 45 F.3d at 1476. The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit joined. See 45 F.3d at 1476. The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention." 45 F.3d at 1476-77. The Tenth Circuit determined:

> Once [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that Judge Murphy authored, and the Honorable Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth Circuit, and the Honorable James Kenneth Logan, late-United States Circuit Judge for the Tenth Circuit joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's

conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth

Circuit stated that the police officers "viewed the very same conduct on the videotape, which this

court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held

that, consequently, "it was . . . not reasonable for the officers to rely on the security guards'

allegations." 147 F.3d at 1257. The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their
> duty to investigate and make an independent probable cause determination based
> on that investigation. . . . Here, [the defendants] did conduct some investigation by
> viewing the videotape and questioning [the plaintiff]. They argue, however, that
> they should be allowed to rely on the statement of the guards for probable cause to
> arrest. Because the officers knew that the allegations of the guards were based on
> observations of conduct captured and preserved on an available videotape, to credit
> this argument would allow a wholesale delegation of police officers' duty to
> investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had

brought her two-year-old daughter to the hospital asserting that the child had complained that her

babysitter's boyfriend had molested her. See 478 F.3d at 1113. Without (i) interviewing the girl,

her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of

sexual assault; or (iii) waiting for the results of the child's medical examination, the officers

arrested the boyfriend. See 478 F.3d at 1113. The Tenth Circuit, in an en banc opinion that the

Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit,

authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of
> insufficient information, . . . or inadequate corroboration, what the officers had fell
> short of reasonably trustworthy information indicating that a crime had been
> committed by [the defendant]. See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir.
> 1986)("A police officer may not close her or his eyes to facts that would help clarify
> the circumstances of an arrest. Reasonable avenues of investigation must be

pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the defendant] was arrested without probable cause.

Cortez v. McCauley, 478 F.3d at 1116 (footnotes and citations omitted).  The Tenth Circuit further

held that

> it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . [at] 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.").  In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.  Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted).  The Tenth Circuit concluded,

therefore, that qualified immunity did not apply.  See 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica

Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL

7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim

against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in

violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court concluded

that the officer had probable cause to arrest the plaintiff based on information gleaned from other

officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a

witness at the scene on the night of the incident -- Jennifer Katz.  See 2011 WL 7444745, at *43-

46.  Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on

the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses."

2011 WL 7444745, at *15. Garcia contended that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights. See 2011 WL 7444745, at *15. Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie. See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . . Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . .

> Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . . The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause. In Romero v. Fay, the Tenth Circuit held:

>> Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree.

> 45 F.3d at 1466. In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest." 147 F.3d at 1257 n.8.

> . . . .

> These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses. Garcia has made

- 35 -

no allegations and presented no facts suggesting that the neighbors were ever around K.J. Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom. Garcia only speculates that Casuas *might* have found something. An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment. In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him. When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . . During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives. The cases that Garcia cites establish only that the police may not ignore available material witnesses. Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed. Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . . Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant

after the safe-house interview.  Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (alterations added).

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's rights under the Fourth Amendment or Fifth Amendment to the Constitution of the United States , the government will generally be prohibited from using that evidence in a criminal prosecution against that person.  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations.  In particular, we have ruled that the Constitution requires the exclusion of evidence obtained by certain violations of the Fourth Amendment, and confessions exacted by police in violation of the right against compelled self-incrimination or due process." (citations omitted)); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").   "For the exclusionary rule to apply, the defendant must show, by a preponderance of the evidence: a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded."  United States v. Villaba, No. CR 13-0664, 2013 WL 4782206, at *27 (D.N.M. Aug. 21, 2013)(Browning, J.)(citing United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006)).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the

prosecution to establish that an exception to the exclusionary rule applies. See United States v.

Torres-Castro, 470 F.3d at 999.[8]

1.      **The Good-Faith Exception.**

---

[8]The Court has previously discussed the exclusionary rule in conjunction with the caselaw that restricts 42 U.S.C. § 1983 claims:

> It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs of Bernalillo Cty., 888 F. Supp. 2d 1776, 1224 n.36 (D.N.M. 2012)(Browning, J.).

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).

### a.  **Warrants Based on Illegally Obtained Information.**

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause

nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

### b.     United States v. Leon.

In United States v. Leon, the Supreme Court faced the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from which he obtained evidence. See 468 U.S. at 905. The Supreme Court noted that excluding this evidence would not deter police misconduct. See 468 U.S. at 918-19. The officer had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid. See 468 U.S. at 918-19. The Supreme Court explained that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter

is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court, thus, concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant."  United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that, "[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  [United States v. Leon, 468 U.S.] at 923 . . . . Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role."  *Id.*  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Id.* (quotation omitted).  Fourth, the exception does not apply when

a warrant is so facially deficient that the executing officer could not reasonably
believe it was valid. *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d 1281, 1316 (D.N.M. 2010)(Browning, J.).

### c. Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in

the Dale County, Alabama, warrant database. See 555 U.S. at 137. In the search incident to that

arrest, officers found drugs and a gun on Herring's person. See 555 U.S. at 137. Herring was then

indicted on federal gun- and drug-possession charges. See 555 U.S. at 138. It turned out, however,

that the warrant under which the officers arrested Herring had been recalled, but the database had

not been updated to reflect that recall. See 555 U.S. at 138. Asserting that the evidence found

during the search was fruit of an unlawful arrest, Herring sought to suppress it. See 555 U.S. at

138. The district court denied Herring's motion to suppress, and the United States Court of

Appeals for the Eleventh Circuit affirmed. See 555 U.S. at 138.

The Supreme Court affirmed the Eleventh Circuit's affirmation of the district court's denial

of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary

rule. See 555 U.S. at 140-46. The Supreme Court agreed with the Eleventh Circuit that, although

the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn

was negligent, it was not reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterated

its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of

probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable

reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922). Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. at 144. The Supreme Court further explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

> ### d.    Davis v. United States.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest. See Arizona v. Gant, 556 U.S. at 341-48. The Eleventh Circuit

had interpreted the Supreme Court's decision in <u>New York v. Belton</u>, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. <u>See</u> <u>United States v. Gonzalez</u>, 71 F.3d 819, 825 (11th Cir. 1996). Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under <u>Arizona v. Gant</u>. <u>United States v. Davis</u>, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim." <u>United States v. Davis</u>, 564 U.S. at 240. The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" <u>United States v. Davis</u>, 564 U.S. at 240 (quoting <u>Herring v. United States</u>, 555 U.S. at 144). The Supreme Court stated: "The conduct of the officers here was neither of these things. The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement." <u>United States v. Davis</u>, 564 U.S. at 240 (quoting and citing <u>Herring v. United States</u>, 555 U.S. at 144). The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." <u>United States v. Davis</u>, 564 U.S. at 240.

## 2. The Inevitable-Discovery Exception.

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" <u>United States v. Christy</u>, 739 F.3d 534, 540 (10th Cir. 2014)(quoting <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984)).

"The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005). In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. 782 F.2d at 152. Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." 810 F. Supp. 2d at 1274 (citations and internal quotation marks omitted). On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question. See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explained:

> In *Cunningham* and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000,] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." *Cunningham*, 413 F.3d at 1204 n.1. In *Cunningham*, police searched the defendant's home after getting his consent. *Id.* at 1202. The defendant later contested the search, claiming his consent was coerced. *Id.* We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred. *Id.* at 1205. In *Souza*, police illegally opened a UPS package that contained drugs. 223 F.3d at 1200, 1202. We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred. *Id.* at 1206. Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.
>
> . . . .

- 45 -

Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] *Larsen*, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203. The Tenth Circuit stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)). Applying the first factor, the Tenth Circuit stated:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case. Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office. Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205. Regarding the second factor, the Tenth Circuit stated:

> [A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong. The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed. Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06. The Tenth Circuit noted that a sergeant eventually obtained a search warrant. See United States v. Souza, 223 F.3d at 1206. Regarding the third factor, the Tenth Circuit stated that, unlike "*Cabassa*, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued." United States v. Souza, 223 F.3d at 1206. The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine. See United States v. Owens, 782 F.2d at 152-53. Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have

revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concluded:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153. "*United States v. Owens* suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d at 1244.

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered." 413 F.3d at 1205. The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- stated:

> Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two

homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204. Regarding the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway. The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05. Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home." 413 F.3d at 1205. Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. [United States v. Souza, 223 F.3d] at 1204. Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search. As a result, we are satisfied the government

has demonstrated that, as in *Souza,* but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found. *Id.* at 1205.

United States v. Cunningham, 413 F.3d at 1205. (citations omitted). The Tenth Circuit, therefore, applied the inevitable-discovery doctrine. See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and determined that the inevitable-discovery exception applied. See 810 F. Supp. 2d at 1275-79. Regarding the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any steps to obtain a warrant before entering Christy's residence. The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence. . . . This factor thus weighs against applying the inevitable discovery exception." 810 F. Supp. 2d at 1275 (citations omitted). As to the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Court concluded:

> The Court finds that Carvo had strong probable cause that Christy committed crimes. At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.
>
> . . . .
>
> . . . . Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable." These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse. Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.
>
> Carvo also had strong probable cause for the federal crime of coercion or enticement. Carvo believed that he had probable cause for the federal crime of

enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

. . . .

. . . . Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement. Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted). Regarding the third factor, -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court held:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy. *United States v. Cunningham*, 413 F.3d at 1205. Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation. Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so. Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI. Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information. Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of

that nature." If the BCSO or Albuquerque FBI were not able to obtain a search
warrant for these locations, Carvo would have written a federal search warrant
himself and come to the District of New Mexico to seek the warrant with himself
as the affiant. Carvo is cross designated to acquire both state and federal search
warrants. This factor thus weighs in favor of application of the inevitable-discovery
doctrine.

United States v. Christy, 810 F. Supp. at 1278-79 (second and third alterations in original)(citations

omitted). As to the fourth factor -- the existence of evidence that the officers jumped the gun,

because they lacked confidence in their showing of probable cause and wanted to force the issue

by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of
> confidence about probable cause and out of a desire to force the issue." *United*
> *States v. Cunningham*, 413 F.3d at 1205. The record indicates that the search
> occurred when it did because the deputies believed that they had exigent
> circumstances to enter Christy's residence. This factor thus weighs in favor of
> application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279. Consequently, the Court applied the inevitable-

discovery doctrine. See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision. See 739 F.3d at 539-44.

Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant

challenged the Court's ruling only on factors two and four -- the strength of the probable cause

showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep

the warrant requirement." United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of

Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)). Regarding

the second factor -- the strength of the showing of probable cause at the time the unlawful search

occurred -- the Tenth Circuit stated:

> The district court found that Officer Carvo knew that K.Y. was a minor,
> there was a large age difference between her and Mr. Christy, the two exchanged

sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y. Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy. Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable. Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law. The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted). Analyzing the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit explained:

Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. Instead, the deputies forced entry because they believed K.Y. was in danger. Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted). The Tenth Circuit concluded, therefore, that the Court properly applied the United States v. Souza factors. See 739 F.3d at 542.

### 3.     The Independent-Source Exception.

If the information found during an "unconstitutional search . . . [is] used to obtain [a] search warrant," then "evidence seized during the later search conducted pursuant to [the] warrant would be inadmissible as fruit of the poisonous tree." United States v. Hatfield, 333 F.3d at 1194 (citing Murray v. United States, 487 U.S. 533, 542-44 (1988)). When determining whether evidence is fruit of the poisonous tree, a court is to consider whether the evidence was "come at

by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Segura v. United States, 468 U.S. 796, 804-05 (1984)(internal quotation marks omitted)(alteration in original)(quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)). Under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree. See Segura v. United States, 468 U.S. at 799 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)). Evidence therefore need not be excluded under the fruit-of-the-poisonous-tree doctrine if there is an independent source for discovery of the challenged evidence. See Segura v. United States, 468 U.S. at 805. "The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence." United States v. Forbes, 528 F.3d 1273, 1279 (10th Cir. 2008)(citing United States v. Lin Lyn Trading, Ltd., 149 F.3d 1112, 1116 (10th Cir. 1998)).

In Segura v. United States and Murray v. United States, the Supreme Court considered the operation of the independent-source doctrine in situations where a search warrant is obtained subsequent to an unlawful search. In Segura v. United States, police unlawfully entered an apartment and spotted drug-trafficking paraphernalia in plain view. See 468 U.S. at 801. A warrant was later obtained, based upon information that the police had known before the entry and executed at the apartment. See 468 U.S. at 801. In the meantime, police stayed in the apartment to preserve the scene. See 468 U.S. at 801. Pursuant to the warrant, they later seized the paraphernalia, as well as cocaine, cash, ammunition, and records of drug transactions, none of which had been observed during the unlawful search. See 468 U.S. at 801. The question before

the Supreme Court was whether the evidence that was not in plain view during the unlawful entry should be suppressed.  See 468 U.S. at 802 & n.4.

The Supreme Court held that, because the warrant was based on information obtained before the search, the evidence seized was from an independent source and was not fruit of the poisonous tree.  See 468 U.S. at 813-14.  Thus, whether the entry and occupation of the apartment was unlawful was "irrelevant to the admissibility of the challenged evidence," because of the independent source for the warrant.  468 U.S. at 813.  Finding any connection between the unlawful entry and the seizure under the warrant to be sufficiently attenuated, the Supreme Court rejected the argument that the police occupation led to the seizure, because the evidence might otherwise have been destroyed.  See 468 U.S. at 815-16.

Segura v. United States was limited to situations where the challenged evidence was not in plain view during an unlawful search.  Murray v. United States addressed this question that Segura v. United States left open: whether the independent-source doctrine was available for evidence observed in plain view during an unlawful search.  See 487 U.S. at 535.  The Supreme Court held that the doctrine also applied to evidence in plain view.  See 487 U.S. at 540-41.

Murray v. United States dealt with a situation in which federal law enforcement obtained a warrant for a warehouse after illegally forcing entry to that warehouse.  See 487 U.S. at 535-36.  Based upon tips from informants, federal agents began surveillance of several defendants.  See 487 U.S. at 535.  Agents observed two of the defendants entering and then leaving a warehouse, one driving a camper and the other driving a truck.  See 487 U.S. at 535.  When the defendants left the warehouse, the agents saw two individuals and a tractor-trailer rig with a long container inside.  See 487 U.S. at 535.  Several other drivers drove the camper and the truck, and ultimately the

vehicles were lawfully stopped and found to contain marijuana.  See 487 U.S. at 535.  After hearing

of the marijuana in the vehicles, agents entered the warehouse and saw numerous burlap-wrapped

bales in plain view.  See 487 U.S. at 535.  The agents left and did not reenter the warehouse until

later.  See 487 U.S. at 535.  They obtained a warrant, without mentioning the entry or relying upon

any observations from that entry, and seized the bales, which contained marijuana.  See 487 U.S.

at 535.

 The Supreme Court stated that "reseizure of tangible evidence already seized" could be

allowed in the right circumstances.  487 U.S. at 542.  "So long as a later, lawful seizure is genuinely

independent of an earlier, tainted one . . . there is no reason why the independent source doctrine

should not apply."  487 U.S. at 542.  A source for a warrant would not be genuinely independent

"if the agents' decision to seek the warrant was prompted by what they had seen during the initial

entry, or if information obtained during that entry was presented to the Magistrate and affected his

decision to issue the warrant."  487 U.S. at 542 (footnote omitted).  Although the district court had

made factual findings that the unlawful entry was not revealed to the magistrate judge and that the

agents did not rely on any observations from the entry in applying for a warrant, the record

contained no findings whether the agents would have sought a warrant absent the entry and so the

Supreme Court ultimately remanded for a determination in the district court regarding the

independent-source doctrine's applicability.  See 487 U.S. at 543-44.

 "A source is genuinely independent if the government can show that the evidence was

obtained by 'means sufficiently distinguishable to be purged of the primary taint.'"  United States

v. Forbes, 528 F.3d at 1278 (quoting Wong Sun v. United States, 371 U.S. at 488).  "By contrast,

a source is not independent if, 'granting establishment of the primary illegality, [the evidence has]

been come at by the exploitation of the illegality.'" United States v. Forbes, 528 F.3d at 1278 (alteration in original)(quoting Wong Sun v. United States, 371 U.S. at 488). To be an independent source, the source does not need to be temporally distinct from an unlawful search: "It was of no moment that [an illegal search and a lawful independent source] all occurred as part of one brief, uninterrupted sequence of events. Rather, it was enough that a genuinely independent source of the evidence" justify a search. United States v. Forbes, 528 F.3d at 1279.

In support of this principle, the Tenth Circuit has approvingly discussed United States v. Moore, 329 F.3d 399 (5th Cir. 2003). In that case, police allegedly unlawfully arrested a motorist and then conducted a canine search of the vehicle's exterior, leading to the discovery of drugs in the trunk. See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05). Despite the closeness of the events, the Fifth Circuit held that the canine search, which was legal in the circumstances regardless of the arrest's legality, was an independent source and thus the drugs found in the trunk were not subject to suppression. See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05). Following United States v. Moore, the Tenth Circuit has held that, although officers may have unlawfully searched the trailer of a tractor-trailer rig, a near-simultaneous lawful canine search that revealed drugs in the cab of the rig was an independent source. See United States v. Forbes, 528 F.3d at 1280.

## ANALYSIS

The Court will not exclude the evidence obtained from Serna, because the Court concludes that Silva had reasonable suspicion for seizing Serna. The Court concludes that Silva seized Serna when Silva ordered Serna to keep his hands visible and that Silva had reasonable suspicion that justified seizing Serna, because Silva (i) observed an individual known to engage in drug

trafficking; (ii) engaged in a hand to hand exchange of cash; (iii) in a park known as a site for drug trafficking. In the following analysis, the Court discusses first at what moment Silva seized Serna, because the timing influences what facts the Court will consider in analyzing Silva's reasonable suspicion. The Court then turns to whether Silva had reasonable suspicion to support the seizure.

I.  **A SEIZURE OCCURRED WHEN SERNA COMPLIED WITH SILVA'S COMMAND TO KEEP HIS HANDS VISIBLE.**

The Court agrees with Serna that the seizure occurred when Serna raised his hands. See Motion at 3-4. The Court concludes that Silva engaged in a show of authority when he ordered Serna and Fuentes to keep their hands visible. In the Court's view, Serna then submitted to that show of authority.

"[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 626). An officer engages in a show of authority when his or her "words and actions would have conveyed . . . to a reasonable person" that "he was being ordered to restrict his movement." United States v. Salazar, 609 F.3d at 1064 (internal quotation marks omitted)(quoting California v. Hodari D., 499 U.S. at 628). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d at 1183 (quoting United States v. Drayton, 536 U.S. at 201). The standard for submission is also objective. See United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d at 14 n.4). "Submission 'requires, at minimum, that a suspect manifest compliance with police orders.'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d at 1326).

The seizure occurred when Silva ordered Serna to keep his hands visible and Serna complied with that order. Silva and Gabaldon were in uniform, armed, and clearly identified as police officers as they approached Serna and Fuentes. See generally Bodycam Video. As Silva approached, he ordered Serna and Fuentes to keep their hands visible. See Tr. at 11:23-24 (Silva); id. at 12:5-7 (Silva). Although the Bodycam Video does not have audio during the portion of the recording in which Silva gives this order, the Court does not doubt that Silva gave this order as a command and not as a polite question beginning a casual exchange. The Bodycam Video's audio begins soon after Serna and Fuentes lift their hands, and Silva's forceful tone when he asks Fuentes "You're buying a lighter for what ten dollars?" disabuses the viewer of the notion that Silva did anything other than issue a command to Serna and Fuentes. Bodycam Video at 00:00:31-:32. Despite Silva's testimony that he would have permitted Serna to leave after commanding him to keep his hands visible, see Tr. at 31:5-11 (Hannum, Silva), no reasonable person would have felt free to walk away from a police officer who was approaching him or her, and who had just forcefully ordered him or her to keep his or her hands visible. See United States v. Mendenhall, 446 U.S. at 554 (clarifying that "the use of language or tone of voice indicating that compliance with the officer's request might be compelled" are factors indicating a seizure); Gentry v. Sevier, 597 F.3d 838, 845 (7th Cir. 2010)(reasoning that a reasonable person "would not believe that he was free to leave" when a "marked police car pull[ed] up" and a police officer, exited the car and without weapons drawn, told the person "to keep his hands up"); United States v. Curry, No. 3:17CR130, 2018 WL 1384298, at *3, *6 (E.D. Va. March 19, 2018)(Lauck, J.)(concluding that a seizure occurred where a police officer ordered two men walking away from him "[L]et me see your hands"); United States v. White, No. 16-CR-10050-JTM, 2016 WL 6037621, at *3 (D. Kan.

Oct. 14, 2016)(Marten, J.)(concluding that an officer seized a defendant "as soon as he" "instructed defendant to put his hands up"); United States v. Davis, No. 09-30047, 2010 WL 610646, at *3 (C.D. Ill. Feb. 11, 2010)(Scott, J.)("Sergeant Walker announced that they were police and ordered the occupants of the Cadillac to raise their hands. At that point, the occupants were not free to leave; there was a seizure for Fourth Amendment purposes."). Cf. United States v. Mosley, 743 F.3d at 1327 (explaining that raising weapons and ordering a defendant to raise his hands was a show of authority); United States v. Pajari, 715 F.2d 1378, 1381 (8th Cir. 1983)(describing that a seizure occurred where police officers ordered a defendant to "raise his hands and leave his car"); Smith v. Kenny, 678 F. Supp. 2d 1093, 1121 (D.N.M. 2009)(Browning, J.)(considering an order to exit with hands up as a factor, along with "[t]he late hour, the phone call, . . . and the additional police presence" "creat[ing] a sense of coercive police authority which a reasonable person would not feel free to disregard"); Harris v. Wydra, 531 F. Supp. 2d 233, 243 (D. Conn. 2007)(Eginton, J.)(concluding that no seizure occurred when a defendant exited her home and the police officers did not order her to raise her hands). Serna complied with Silva's command and put his hands on his head, where Silva could see them. See Tr. at 19:15-17 (Silva); see Bodycam Video at 00:00:25. At this moment, when Serna submitted to Silva's show of authority, the seizure occurred. See United States v. Mosley, 743 F.3d at 1327 (stating that the moment of seizure occurred when the defendant raised his hands). Even the United States recognizes that it faces an uphill battle in trying to argue that a reasonable person in Serna's position would feel free to leave. See Tr. at 43:3-4 (Outler). Although the United States argues that Silva and Serna's interaction was an exchange of a few questions, see Response at 4, the United States concedes that this contention is "not worth arguing about," Tr. at 43:3-4 (Outler).

## II.   **SILVA HAD REASONABLE SUSPICION TO SEIZE SERNA.**

The Court concludes that, when Silva seized Serna, Silva had reasonable suspicion.  Serna was an individual whom APD had previously arrested for drug-related activities and in whom APD had an interest.  See Tr. at 13:6-11 (Silva); id. at 13:24-25 (Silva), id. at 14:14-19 (Silva); id. at 14:24-15:1 (Silva).  APD regularly arrests individuals in Robinson Park for drug-related activity and the park has a reputation for drug-related activity.  See Tr. at 13:7-8 (Silva); id. at 9:8-12 (Silva).  Silva observed Serna and Fuentes engaged in a hand-to-hand exchange of cash.  See Tr. at 10:18-21 (Silva).

The reasonable suspicion analysis is a totality of the circumstances test: "[i]n determining whether reasonable suspicion exists, [the Court] must look to the 'totality of the circumstances,' rather than assessing each factor or piece of evidence in isolation; '[n]o one factor is determinative.'"  United States v. McGehee, 672 F.3d 860, 867 (10th Cir. 2012)(first quoting United States v. Salazar, 609 F.3d at 1068; and then quoting United States v. Holt, 264 F.3d at 1220).

> While the fact that Defendant was in an area known for criminal activity, *standing alone*, is not a sufficient basis for suspecting that Defendant was engaged in such activity, "an area's disposition toward criminal activity is an articulable fact that may be considered along with more particularized factors to support reasonable suspicion."

United States v. Gutierrez-Daniez, 131 F.3d 939, 942-43 (10th Cir. 1997)(emphasis in United States v. Gutierrez-Daniez)(quoting United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997); and citing United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996)).  See United States v. Briggs, 720 F.3d 1281, 1286 (10th Cir. 2013)("[A] suspect's presence in a high-crime area is still relevant to whether the totality of the circumstances justify a detention.").  Likewise, "'[s]tanding

alone, a criminal record . . . is not sufficient to create reasonable suspicion of anything[.]' . . . But where . . . the circumstances of the stop itself interact with an individual's criminal history to trigger an officer's suspicions, that criminal history becomes critically relevant for <u>Terry</u>-purposes." <u>United States v. Hammond</u>, 890 F.3d 901, 906-07 (10th Cir. 2018)(quoting <u>United States v. Rice</u>, 483 F.3d 1079, 1085 (10th Cir. 2007); and citing <u>United States v. Palmer</u>, 360 F.3d 1243, 1246 (10th Cir. 2004)). "[D]eference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions," <u>United States v. McGehee</u>, 672 F.3d at 867 (internal quotation marks omitted)(quoting <u>United States v. Wood</u>, 106 F.3d at 946), but the Court "need not rule out the possibility of innocent conduct," <u>United States v. McGehee</u>, 672 F.3d at 867 (internal quotation marks omitted)(quoting <u>United States v. Albert</u>, 579 F.3d 1188, 1197 (10th Cir. 2009)).

The Court begins its analysis by discussing two preliminary matters. First, the Court discounts Silva's testimony regarding what bill he observed. After viewing the Bodycam Video, the Court doubts that Silva discerned the denomination of the rolled-up bill in Fuentes hand. Silva would have struggled to see the bill accurately even after Silva stopped ten-to-twenty feet from the men. Moreover, Silva misidentified the bill during the encounter; he mistook the bill for a ten-dollar bill. Later events revealed that Fuentes was holding a twenty-dollar bill. <u>See</u> Tr. at 25:15-26:5 (Hannum, Silva). Additionally, in the Criminal Complaint at 1-2, filed January 22, 2019 (Doc. 34-1), and in his testimony before the Court, Silva reports that he observed Fuentes holding a twenty-dollar bill, <u>see</u> Tr. at 13:15-23 (Silva); <u>id.</u> at 15:24-16:13 (Silva, Outler); <u>id.</u> at 25:15-26:5 (Hannum, Silva). These statements differ from what the events on September 3, 2018, suggest that Silva perceived. The Bodycam Video shows that Silva assumed that Fuentes held a ten-dollar

bill; he asked Fuentes what he was buying for ten dollars.  See Bodycam Video at 00:00:31-:32.

Silva gave the later statements after he discovered the bill's actual denomination.  See Tr. at 27:14-

16 (Hannum, Silva).  The Court is, therefore, skeptical of both Silva's knowledge about the bill at

the time of the encounter and of his accuracy after the encounter.

Second, although Serna tries to plant doubt regarding whether Silva recognized Serna in

Robinson Park, see Tr. at 29:11-30:1 (Hannum, Silva), the Court accepts Silva's statement that,

on entering the park, he recognized Serna, see id. at Tr. at 13:16-19 (Silva); id. at 15:6-9 (Silva).

Serna presents evidence that Silva never himself arrested Serna, see Tr. at 28:11-13 (Hannum,

Silva), and that, during an encounter between Silva and Serna a few days before the September 3,

2018, events, Silva mistook Serna for someone else.  See Tr. at 29:14-30:1 (Hannum, Silva).  The

Court agrees with Serna that these events bring into question whether Silva knew who Serna was.

Serna's contentions do not, however, definitively show that Silva did not recognize Serna on

September 3, 2018.  According to the United States and Silva, during the earlier encounter with

Serna, Silva realized his mistake and then correctly identified Serna.  See Tr. at 32:19-33:9 (Outler,

Silva).  Silva, therefore, had realized who Serna was, and Silva's mistake might have corrected

Silva's image of Serna and reinforced what Serna looked like.  Moreover, Silva stated in court and

under oath that he recognized Serna once he entered Robinson Park.  See Tr. at Tr. at 13:16-19

(Silva); id. at 15:6-9 (Silva).  The Court, accordingly, concludes that it should not disregard Silva's

testimony.

The Court now turns to whether Silva had reasonable suspicion to seize Serna.  The Tenth

Circuit has held that reasonable suspicion exists where an officer observes a defendant engaging

in exchanges that resemble drug transactions, the defendant or the individual with whom he deals

has a history of drug-related activities, and the individuals are in an area associated with drug-related activities. See, e.g., United States v. Carter, 172 F. App'x 883, 884-86 (10th Cir. 2006)(unpublished); United States v. Ellis, 180 F. App'x 827, 829 (10th Cir. 2006)(unpublished). In United States v. Carter, for instance, the Tenth Circuit upheld a district court's finding of reasonable suspicion when police officers had watched a car parked in front of a home from which the officers had previously seized cocaine and guns, and that had a reputation as a drug house in a high crime neighborhood. See 172 F. App'x at 884-86. The police officers obtained reasonable suspicion to question the individuals in the car when, "on two or three occasions a female passenger sitting in the backseat of the car had exited the vehicle, approached the front door of the suspect house, remained for less than a minute and then returned to the vehicle" even though the police could not see whether the woman contacted anyone or whether the house door opened. 172 F. App'x at 884-86. Likewise, in United States v. Ellis, the Tenth Circuit addressed a situation in which police officers received several complaints about drug transactions in an area, and, while sitting in a car in that area, officers watched the defendant, who had a criminal record, approach and engage with the driver of a parked car. See 180 F. App'x at 829. The officers had reasonable suspicion to approach the defendant, because two other individuals had earlier participated in what appeared to be hand-to-hand, drug transactions with the driver. See 180 F. App'x at 829.

The Court concludes that Silva had the requisite reasonable suspicion. Here, Silva knew that Robinson Park had a reputation for hosting drug-related activities, and he and his officers had previously and routinely arrested people from the park for such activities. See Tr. at 13:7-8 (Silva); id. at 9:8-12 (Silva). Silva likewise recognized Serna as an individual who had previously engaged in drug-related activities, who Silva's officers had previously arrested, and in whom APD had an

interest.  See Tr. at 13:6-11 (Silva); id. at 13:24-25 (Silva), id. at 14:14-19 (Silva); id. at 14:24-15:1 (Silva).  Immediately before seizing Serna, Silva observed Serna and Fuentes standing close together, in a hand-to-hand exchange of cash, and acting in a manner that, to Silva's experienced eye, resembled the actions of individuals engaged in a drug transaction.  See Tr. at 8:12-13 (Silva); id. at 8:9-13 (Silva); id. at 10:18-21 (Silva); id. at 13:19-21 (Silva); Bodycam Video at 00:00:16-:21.  The Court trusts Silva's ability to identify suspicious activity, cf. United States v. McGehee, 672 F.3d at 867, and, given these facts, Silva had more "than an inchoate and unparticularized suspicion or hunch" that Serna was engaged in buying or selling drugs, United States v. Whitley, 680 F.3d at 1233-34 (quoting United States v. Chavez, 660 F.3d at 1221).

The Court disagrees with Serna that it should require more evidence of a drug sale before concluding that reasonable suspicion existed.  Serna suggests that reasonable suspicion requires that Silva have observed a syringe, baggie, or other item of drug paraphernalia, see Tr. at 39:9-13 (Court, Hannum), and implies that an observation of cash is too ambiguous to support reasonable suspicion, see Motion at 5; Tr. at 38:25-39:2 (Hannum).  Serna's arguments, however, do not account for the lower standard for reasonable suspicion.  The Tenth Circuit has upheld findings of reasonable suspicion even when officers did not visually observe evidence of drugs; in both United States v. Carter and United States v. Ellis, the Tenth Circuit held that reasonable suspicion existed when individuals' actions resembled the timing and manner of drug sales, but the officers did not see the drugs.  See United States v. Carter, 172 F. App'x at 884-86; United States v. Ellis, 180 F. App'x at 829.  Here, Silva saw gestures resembling a drug sale and individuals -- one of whom had a criminal history involving drug-related activities -- exchanging cash.  Silva saw half of a

purported drug transaction. These observations are sufficient to establish reasonable suspicion.[9]

Accordingly, the Court denies the Motion.[10]

---

[9]The Court is not commenting on whether a cash exchange in a high-crime area alone would suffice to establish reasonable suspicion; APD's previous knowledge regarding Serna influences the Court's decision. As here, where an officer saw an individual, in whom a police department has an interest because of his drug-related activity, engage in the cash half of a drug sale, the Court will not hamstring the officer's ability to interfere. The Court does not intend to make any sweeping statements, because each case turns on its own circumstances, but it here concludes that Silva had sufficient evidence to have reasonable suspicion that Serna was engaged in drug-related activity.

[10]At the hearing, the United States argued that the reasonable suspicion continued to build after Silva seized Serna. See Tr. at 43:1-44:15 (Outler, Court). Because Serna offers no real contentions against these arguments, see Tr. at 45:18-46:6 (Hannum); id. at 46:23-47:3 (Hannum), the Court will not address this issue. Moreover, the Court notes that, here, reasonable suspicion built into probable cause when Serna revealed that he had a gun, because then Silva had probable cause that Serna had a gun.

The Court also notes that, if Silva lacked reasonable suspicion, no exceptions to the exclusionary rule apply here. First, the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acts in good faith. See United States v. Davis, 564 U.S. at 236-37. No evidence here reveals such good-faith errors. The entirety of the occurrence here boils down to Silva sighting and approaching Serna and Fuentes. Second, "[t]he inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted 'if an independent, lawful police investigation inevitably would have discovered it.'" United States v. Cunningham, 413 F.3d at 1203 (citations omitted)(quoting United States v. Owens, 782 F.2d at 152; and citing Nix v. Williams, 467 U.S. at 444, 448; United States v. Romero, 692 F.2d at 704)). The United States has presented no evidence suggesting that APD would have ever searched Serna if Silva had not identified him in Robinson Park. Third, under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree. See Segura v. United States, 468 U.S. at 799 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)). "A source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'" United States v. Forbes, 528 F.3d at 1278 (quoting Wong Sun v. United States, 371 U.S. at 488). Serna admitted that he had the gun as Silva questioned him at the beginning of the pat down that closely followed the seizure. See Bodycam Video at 00:00:42-01:11. As Silva evoked Serna's admission as part of the pat down, the Court finds no evidence to suggest that the discovery would not have been tainted if the seizure were illegal.

**IT IS ORDERED that** Defendant's Motion to Suppress Evidence Obtained as a Fruit of

Unlawful Seizure, filed January 6, 2019 (Doc. 28), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Peter J. Eicker
Thomas A. Outler
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

D. Eric Hannum
Lomas Law Complex
Albuquerque, New Mexico

       *Attorney for the Defendant*